## Salyers et ux. v. Salyers et al.
(Decided March 18, 1938.)

HARRY H. RAMEY for appellants.
EARL R. COOPER for appellees.

OPINION OF THE COURT BY JUDGE THOMAS—Reversing.

In January, 1933, A. B. Salyers died intestate, a citizen and resident of Magoffin county, leaving a widow, Lauraney Salyers, and some six or seven children, and descendants of deceased children. Before his death and prior to May 19, 1931, he was the owner of some 600 acres of land in the county of his residence and had made partial division thereof between some of his children to the extent, as he estimated, of about $1,000 each in value. To others he had advanced that amount of

money, but to some of his grandchildren, and to his youngest son—the appellant and one of the plaintiffs below, Goebel Salyers—he had advanced nothing. On the last indicated date (May 19, 1931) A. B. Salyers and wife conveyed jointly to the appellees and defendants herein, four children of the deceased and to a grandchild, the representative of his deceased daughter B. S. Watson, and also to the plaintiff, Goebel Salyers, the mineral under a described tract of land. The acreage embraced in that deed is not stated in it, nor do we find it anywhere in the record. However, it does appear that prior to that time A. B. Salyers had given certain mineral leases and, perhaps, operations had commenced thereunder, in which case the deed, if it had become effective, would have served to convey only the reserved royalty from minerals obtained under leases that A. B. Salyers had theretofore executed, as long as they lasted. We will hereafter refer to that deed as the "mineral deed."

On July 29, 1932, about 14 months after the execution of the mineral deed, A. B. Salyers and wife conveyed absolutely (including all minerals) 100 acres of his land, referred to in this record as the "home place," to Goebel Salyers and wife in consideration that the grantees would pay to three designated grandchildren the sum of $500 each, which, with the $1,000 to which he was supposed to be entitled in order to equalize him with his brothers and sisters and the heirs of the deceased ones, would make the consideration $2,500. However, in that deed the grantor reserved the timber on the land above 12 inches in diameter, and reserved the right for himself and wife to occupy the place the rest of their lives. Their son, Goebel, and his wife, were at that time, and had been for a considerable time prior thereto, residing in the Salyers homestead with his father and mother. About five months after the execution of that deed, A. B. Salyers died with the mineral deed never having been recorded. Some time after his death his son W. M. Salyers (a vendee therein) was at the home of his father, and mother—as well as that of Goebel Salyers and wife—and while there he obtained the mineral deed, getting it from a drawer in a table wherein A. B. Salyers had kept his private papers while living, and he immediately filed it for record with the county court clerk.

Matters drifted along until February 26, 1935, when Goebel Salyers and wife filed this equity action against his brothers and sisters—and the heirs of those who were dead—who were joint grantees with him in the mineral deed, and in their petition they averred that it (mineral deed) was never delivered to any of the grantees, nor was it ever accepted by them, and for which reason it was ineffective for any purpose, and that its purported conveyance of the minerals under the 100-acre tract of land conveyed by his deed that he obtained from his parents in July, 1932, was a cloud upon his title to that tract, and he sought its removal by having the mineral deed declared void and of no effect. The answer of defendants put in issue the alleged invalidating facts of the mineral deed, and after evidence taken and the cause submitted the trial court dismissed plaintiffs' petition, thereby holding that there was both a delivery and an acceptance of the mineral deed so as to pass title to the minerals conveyed thereby, and from that judgment plaintiffs prosecute this appeal. It will be perceived that the only question for determination is one of fact, i. e., whether or not the mineral deed was ever delivered in a manner to comply with the legal requisites therefor, or, if attempted, whether or not it was accepted in a manner and form so as to pass title.

It is conceded—because true—that there is no particular form, prescribed by the law, of procedure for the effective delivery of a written instrument, including a deed; nor is there any prescribed form of procedure evidencing legal acceptance by the other party thereto. Bunnell v. Bunnell, 111 Ky. 566, 64 S. W. 420, 65 S. W. 607, 23 Ky. Law Rep. 800, 1101; Hacker v. Deaton, 200 Ky. 383, 254 S. W. 1055, and other cases therein referred to, together with many following them. It is likewise a correct principle of law that the delivery to and acceptance of a deed (or other written instrument) executed to a number of parties jointly and in the same capacity may each be made and effectively accomplished by one of them for himself and his other jointly contracting parties. Therefore, if the mineral deed was properly delivered to Goebel Salyers at the time it was executed or at any other time before the death of the grantor therein, and was legally accepted by him, it then became effective, not only so far as he is concerned, but

also as to his joint vendees. Knight v. Berry, 10 Ky. Op. 336, wherein we said: "Where a deed is made to a number of grantees and delivered to one of them, who accepts its delivery to him, acceptance by him is a delivery to and acceptance by all." There is no pretense in this case that the mineral deed was ever delivered to or accepted by any of the grantees therein, except Goebel Salyers, and the decisive issue of fact in the case is narrowed to the single inquiry as to whether or not its delivery to and acceptance by him was made at any time after its execution.

The draftsman of both deeds referred to, who was the deputy county clerk who took the acknowledgment of the grantors in each, was Morgan Rowe, who, besides being deputy county clerk at the respective times, was also a minister of the gospel. He stated that he prepared both deeds at the instance of A. B. Salyers in the latter's residence; that their contents were dictated by him; and that he (Rowe) drafted them accordingly. After the mineral deed was signed and acknowledged by both grantors, Mr. and Mrs. A. B. Salyers, the witness stated that it was passed to Goebel Salyers, who read it and then stated that he would not accept it and threw it down on the table. He stated that he soon left, and that in a little more than a year thereafter A. B. Salyers again sent for him and that he went to the old man's residence and upon arrival there he told witness that he had studied the proposition over for more than twelve months and that he had decided not to put his first (mineral) deed to record. Mr. Salyers likewise told him at that time that his son, Goebel, would have to pay to three of the granchildren $500 each, and with the $1000—representing his supposed interest in the land as heir apparent so as to make him equal with the other children—would be a larger burden than should be imposed upon him. In other words, that to deprive him of the minerals under the land then proposed to be conveyed to him and to impose upon him the payment of the $1,500 would not allow him to reap out of the father's estate his supposed share of $1,000. To use the language of the witness, the old man said: "I have decided that this first deed is not a deed at all; that if Goebel had to go ahead and pay these debts that he wouldn't have anything to pay them with." Witness likewise testified that the old man said to him: "'That

deed is in here in my stand table drawer,' and that it would never be put to record." Whereupon the deed under which Goebel Salyers and wife now claim title was prepared, executed, and delivered. There was present at that time Green Salyers, a brother of A. B. Salyers, who was also present when the mineral deed was made, and he corroborates in every respect the testimony of Rowe.

Two witnesses, unrelated to the parties, testified that in a conversation with A. B. Salyers, after the last deed, supra, was executed, and some three months before his death, he stated, in substance, that Goebel refused to accept the mineral deed and that he (A. B. Salyers) had studied the matter over for about a year and that he had concluded that it would be inequitable to deprive Goebel of the mineral under the tract of land that he had conveyed to him, in view of the fact that the $1,500 payments therein specified were demanded of him, "and he said it looked like the land was going to have to stand good for the notes" of $500.00 to each of his three grandchildren. The witnesses then asked him what kind of a deed he had executed the last time, and he answered, "I deeded the land to Goebel, the timber was reserved, at our death or to the heirs," which latter expression, of course, meant that the reserved timber went to the heirs, and which is in strict accordance with the language of that deed. One of the heirs in testifying (and he was corroborated by other witnesses) stated that some four days before A. B. Salyers died the latter stated to him (witness) that he would soon be drawing a check—indicating that royalty would be coming in to the heirs after the death of A. B. Salyers—but we detect but little if any probative effect to that statement, since there was 500 acres of land, more than the 100 acres described in the Goebel Salyers deed of July 29, 1932, and the old man could very readily have referred to royalties from leases on the other land that he owned when he made that remark, if he did do so.

A son-in-law who lived in Ohio testified that he visited the home of A. B. Salyers about four days before his death, and the latter told him, "I have got the deeds fixed the way I want them, the way I want them to go and how I want them to go." That witness left for his home and was not present at the time of Mr. Salyers' death. Of course, that declaration could not change the

effect of a prior conveyance duly delivered and accepted, but it is evidence of not only the intention and purpose of the grantor in the deeds above referred to, but it likewise shows his interpretation of the transactions wherein they were brought about.

The only testimony of any substance negativing that given by Rowe, and Green Salyers was the testimony of Mrs. A. B. Salyers, who in the meantime had fallen out with her son, Goebel, for some undisclosed reason. She attempted by her testimony to establish the delivery and acceptance of the mineral deed. She testified that on May 19, 1931, at the time the mineral deed was executed, there was also one prepared and executed to Goebel Salyers for the surface of the 100 acres of land now absolutely claimed by him under the later deed of July 29, 1932. But that deed (if made) was not produced, and no one ever claims to have seen it. Rowe, in giving his testimony, stated that he had no recollection of preparing but the one mineral deed at that time. But, however that may be—and admitting for the purposes of the case that there was a second deed prepared on that occasion conveying to Goebel the surface of the 100 acres claimed by him—it would still not necessarily militate against the effectiveness of the last deed executed to him on July 29, 1932, for the whole of the same conveyed tract, excepting the reserve timber.

In speaking of the mineral deed, Mrs. Salyers was asked: "Q. At the time you signed this mineral deed, do you know to whom your husband gave the deed? A. To Goebel, I *reckon* and he put it up and it was a long, long time before it was put on record. He (her husband) said, 'Son, put those deeds on record, and if you don't give them to some of the others or burn them up.' And it was a long time before he done that," (Our italics.) In speaking of the reason why her husband executed the second deed to Goebel of date July 29, 1932, she stated: "He studied it over, and there was no use for Goebel to have the land and timber too and he wanted another deed made so the children would all fare alike in the land and timber." She later stated, when asked whether her husband made any statements about the deeds after they had all been signed: "No, I reckon not, only he wanted another deed made and the boys to all come in it and fare alike." She also stated,

when asked as to what her husband said about the deeds after they had been made, that "he wanted them made that way." She was asked: "After your husband died, did you know where the deeds were? A. No, he had them; Goebel was *supposed* to have them." (Our italics.) She then told about how her son, William, got possession of the mineral deed, which was found in the drawer, as hereinbefore recited. She was then asked: "Did you see Goebel read the (mineral) deed and hand it back to your husband and tell him he would not accept it? A. I don't know whether I can remember that or not."

On cross-examination she explained fully the reason why Mr. Salyers wanted Goebel to have the tract of land conveyed to him absolutely—excepting the reserve timber—and which reason was the same one assigned by her husband to Rowe, i. e., that to require him to pay the $1,500 to the three grandchildren would so burden his portion as that he would not realize the amount of $1,000 intended to be advanced to him to make him equal with the other children. We do not interpret her testimony as a whole as materially contradicting that given by plaintiff's witnesses, and especially the deputy county clerk, and Green Salyers, the brother of the vendor.

The rule measuring the authority of this court in dealing with fact findings by the trial court is not to disturb them if there exists in our minds nothing more than a doubt as to the propriety of the trial court's determination. The practical import of that rule is, that if we conclude that the testimony shows that the trial court improperly determined the issue of fact involved, we not only have authority, but it is our duty to so declare. Following that rule we are driven to the conclusion that the court improperly determined that the mineral deed was ever legally delivered or accepted with the necessary purpose and intent of making it legally effective.

Wherefore, for the reasons stated, the judgment is reversed, with directions to set it aside and to sustain the prayer of the petition, by entering a decree canceling the mineral deed referred to, and for other proceedings not inconsistent with this opinion.